with case number 17-60175, Hartzog v. Hackett, and we'll hear from Mr. Doughty. If it pleases the court, we respectfully submit that the entry of summary judgment in favor of the jailer, the defendant in this case, was inappropriate. There were disputed facts that rendered inappropriate the entry of summary judgment. So what is your best disputed fact, if you will, meaning the most prominent disputed fact that you think really stands out in this case? Your Honor, the disputed facts are very, very numerous. Deputy Hackett knew that my client, Mr. Hartzog, had been in woods for two nights and parts of two days before he was taken to the jail. The disputed facts are whether or not the sheriff of the county had told Deputy Hackett by telephone if that Steve Hartzog out there take him to jail. If he needs to go to the ER, needs medical attention, take him to the ER. The disputed facts are that he continued to deteriorate after he was taken to the Lawrence County Jail. He was able to walk into the jail that morning before 8 o'clock. They were unable to book him because he was belligerent. He was not responding to questions. The only medical attention they gave him was to put him in the detox cell at the Lawrence County Jail to sleep it off. Wouldn't that ordinarily be what you would do in that situation? I mean, how would they know that there's something different about Mr. Hartzog? What Mr. Hackett said the reason they were doing that for is because usually we know that if we put him in the detox cell and let him sleep it off for a couple of hours, they're okay. We can get them to answer questions. We can put them through the booking. But the first couple of hours explain that in the detox cell, Mr. Hartzog was not improving. His condition was noticeably deteriorating. After another couple of hours, it had deteriorated to the point where Mr. Hartzog, after acting very eccentrically and oddly all morning, had fallen off the cot in the detox cell, was face down on the floor. At some point, more than that second couple of hours, at 1140-something, the two jailers come in to secure him, to take him to the place where Mr. Hartzog's mother and sister were to speak with him. They stand over him. He's been on the floor for 15 minutes. He's face down on the floor, making no movement of his legs, arms, or extremities. When they come in, he is unable to—he is not conscious that they are there. He makes no movement. They realize he can't walk anymore, even though four hours earlier he had walked into the jail. He can't walk anymore, so they go and get a wheelchair to put him in it, strap him in it because he's sliding out of the wheelchair. But doesn't all that show—I mean, there may be negligence here. It's obviously a tragic situation, but there may be negligence. There may well be recklessness, but the constitutional standard is deliberate indifference, which basically means either you want the person to be harmed or you just don't care. I mean, that's what indifference is. I don't care if he gets worse, his condition worsens. But here they're monitoring him. They got permission for his mother and sister to come visit him. Then they got permission for them to go bring a doctor to him, which unfortunately he passed away before that doctor arrived. But they gave him water, and as you just said, they put him in a wheelchair to bring him out there, and they were in the process of putting weaker restraints on him. So when you look at all that conduct, sure, in retrospect they should have done more. They should have let him go to a doctor. We all know that now. But given all those things they did to try to help him, how can you say it was a situation where they just didn't care what happened to him? I would draw a parallel to the case on point, the 2003 Fifth Circuit decision, Austin v. Johnson, the boot camp case where this youngster that was in the boot camp passed out, became dehydrated, and fell out. He fell out. He was unconscious. And the court there said the defendant's conduct was perhaps only negligent for the first little while. But their failure to call an ambulance for almost two hours while he lay unconscious and vomiting rises to the level of deliberate indifference. And I draw a parallel. But here they did call an ambulance as soon as when they were putting the softer restraints on him and he went unconscious. They unconsciously called an ambulance immediately at that point. It was too late. Too late. But they should have called the ambulance at 11.40 earlier that morning. When the jailer Earl and jailer Mullins walked in, saw him on the floor. He was not conscious of their being there. And talking about the water and everything that was provided, they stuck it in there, but it wasn't touched. They never provided. But back to the question you raised, sir. It's more than negligence if you look at the parallel factual situation in Austin v. Johnson. But in this case, they had good reason to believe that he was under the influence of some kind of drugs. Yes, sir. Because the day before they had seen him out in the woods. Yes, sir. And he was apparently pretty obvious to the deputies that he was under the influence. And then the question I have is what the deputies testified that they deal with a lot of intoxicated people, people under the influence of various drugs, and that's what this guy looked like. And so why were they deliberately indifferent in believing that? Initially, they might not have been. Initially, they may have been correctly assuming, let him sleep it off for a couple hours. But as I've already responded, Judge, his condition deteriorated. I mean, is that necessarily inconsistent with being intoxicated under the influence of some drug? Well, at some point you've got to become aware that it's deteriorating to the point where he may have a serious health risk. And when you walk into a cell that he had walked into four hours earlier and stand over him and do nothing except he can't walk anymore, go get a wheelchair, they put him in the wheelchair, he keeps sliding out, they are able to give up the hallway to where his sister and her mother are. The sister says words to the effect, Steve is dehydrated. He can die from dehydration. The guy that's in the room with him knows that Steve's been out in the woods Sunday night, Monday, and Monday night before they go and find him on Tuesday. But, I mean, at this time frame of 1140 that you've been focusing on, it's around the time that the family arrived. And so then they're interacting with the family. They're talking about, should we bring a doctor? Should we do this? Should we do that? And they're off trying to get a doctor. So stuff is happening. It's not like, oh, this guy's lying on the floor. Let's just leave him lying on the floor for the next several hours. Things are happening. Again, we know, not the things that should have happened, but it's not like they're ignoring him. They're dealing with the family. They're talking about the family's going to go get Dr. Stevens. They're doing all of that. And then while the family's off getting the doctor, he deteriorates further, and they do call the ambulance, and by then it's too late. So, I mean, I absolutely would be apoplectic if I were the family member in this situation. So I completely understand how they feel. But that's not the legal standard, what the family would want. The legal standard is whether they show deliberate, is there evidence of deliberate indifference in all this. And isn't all this activity inconsistent with deliberate indifference? No, ma'am. It's not activity that a reasonable person would have undertaken. When they deny. A reasonable person's a negligent standard. Talk to me about deliberate indifference. We've seen cases where somebody was collapsed on the floor for hours and the jailer just ignored the person. This isn't that case, is it? Yes, ma'am. Well, because they pulled him up, they put him in the wheelchair, they brought him out to the family. All of that happened in roughly this time frame, this 1140 time frame that you're focused on. As I've said, the gentleman walked in at 8 o'clock that morning, his condition deteriorated. They did nothing, absolutely nothing in the way of providing him any sort of medical attention other than let him sleep it off in the detox. But they had him in a monitored detox. They looked through the camera at him. That's a monitored detox. I have seen where they leave him in a cell and nobody checks on him for hours. This is a monitored by camera detox cell that's for this purpose. And then around this time that you say things are deteriorating is when the family showed up, they bring him out there, they strap him in the wheelchair, they bring him out, they have this dialogue about the doctor and all of that. So, again, that's not just ignoring him. It's maybe not what they should have done, but it's not ignoring him. Well, the officer that was in charge of monitoring those video cameras, Mr. Mullins, after monitoring for a while that morning said to his superior, Chief Taylor Earl, this man don't need to be here. Everybody was aware of the serious condition that Steve Hartog was in. And for the life of me, there having said, okay, go, we're not going to do it, but you can go get a doctor and bring him to the jail. And Dr. Derwin, our emergency medicine doctor, in his testimony, showed how improper that would have been. He said if somebody presents with labs like this, they're going to need full support because eventually they're going to have respiratory depression and not be able to breathe. So this is a true emergency case where the patient is going to need to be put on the ventilator and then bolstered. I mean, again, it's easy enough in hindsight for a medical person to say. And, I mean, again, if it's my loved one, your loved one, you're going to do everything you can for the person, no question about that. That's not the standard, though. The standard is whether this conduct, shown by the video, taking the evidence as best case for you all, best legal case for you all, shows evidence of deliberate indifference versus negligence, stupidity, and all of those other things. And that's the hard part. It's a very hard standard. I completely, completely understand the family's dismay with this and disgust and devastation with this, all of which I think is fair and justified. But the legal standards we have are really high, and that's the problem that I have with it as a legal matter. And, again, I'd draw the correlation with Austin v. Johnson. There was a point in time where the Fifth Circuit said their actions may have been only negligence. But then there became a point in time when they said their failure to call an ambulance for almost two hours rises to the level of deliberate indifference. And with the information that Deputy Hackett had, the information that he tells Deputy Smith, this man is so much worse off than he was when I brought him in earlier. Later that morning, that's what he says, the man's getting so much worse off. He is unconscious on the floor of the detox cell. The deputies are standing over him. They can't get him up to walk. Well, they had crossed the point where it was no longer negligence. It was deliberate indifference, as the Fifth Circuit spoke about, in Austin v. Johnson. And we respectfully submit that the court was in error. The district court, when he said he was out there one night, it was two nights. That made it a serious dehydration case. The other things that the court said, said that Hackett had subjective knowledge of facts, that he actually drew an inference of a substantial risk of serious harm to Hartzog. He had the subjective knowledge that the man had been out in the woods since Sunday, and he was there Sunday night, Monday, Monday night. But we don't know whether he had water. Did they know that he didn't have any water? Yes, sir. We know that because of what Dr. Derwin said after reviewing the lab results after he was named. We know that, but did the deputies know? Because people camp in the woods for weeks. They take water with them. Did the deputies know on the day of the event that he had been without water? They were told Stacy had a discussion with him, with Mr. Hackett, that afternoon, when Stacy and the mother were there. He's been in the woods for two nights, and these days he's dehydrated. There's no water. There's no food. And that's backed up again, and he, in his conversations, Hackett said, I know what dehydration is. If you go too long without water, you're subject to dehydration, and that can be fatal. Okay. Thank you, Mr. Dowdy. We reserve time for rebuttal, and we'll hear from Mr. Byers. Mr. Byers. May it please the Court. I want to focus on the constitutional standards here and on the record on appeal, not what may have been in the record, not what was 20-20 hindsight many months later, but what happened at the time and the constitutional standards by which to judge that. The Constitution, and this is in response to a question earlier that was put to Mr. Dowdy, the Constitution is designed to deal with deprivations of rights, not errors in judgment. There may have been an error in judgment here. Looking back on it, that may be the case. But the question for purposes of this Court and the question below for Judge Sterritt was, was there deliberate indifference for violation of the 14th Amendment rights? And as a component part to that was qualified immunity available to these officers. These are different standards. In looking through the cases, sometimes it's confusing to look at the standards. It is to me at least. But the deliberate indifference standard goes to the violation of this 14th Amendment right, and then the objective standard, objective reasonableness, goes to the qualified immunity. Not much has been talked about on qualified immunity, but it is very important, and Judge Sterritt found that to be the case in addition to the fact that there was no violation or no deliberate indifference. And the standard is high. I don't think anyone doubts that. And to demonstrate deliberate indifference, the test is a little bit of a tongue twister, but in this Court, in the Thompson case, in this Court, each defendant must have had subjective knowledge of facts from which an inference of substantial risk of serious harm could be drawn, number one. Each defendant actually drew that inference, and I think that's what we keep talking about here. May I address counsel's statement that the deputy who brought him in told the other deputy, look, he's so much worse than when we brought him in. He doesn't belong here. Well, here's the thing about it. That's Deputy Johnny Hackett. Johnny Hackett is the person who, first of all, it's been minimized what happened on Monday, October the 19th, and all this focus is on the 20th. It's got to be remembered, and the Court asked some questions about this. Mr. Hartzog was turned over to his mother on October 19th by this very same deputy, Deputy Hackett. And did Deputy Hackett know that she did not bring water, food, or what have you to him? No. He was turned over to her on October the 19th. So he goes out to Mr. Kirby's place and finds Stephen Hartzog for a second date on the 20th. He takes him in. He's able to walk. Then the difference here between the jailers, who at all times either had eyes or hands on Mr. Hartzog, that's what distinguishes this case from all these other cases, eyes or hands on him at all times. Mr. Hackett came back in after going out on patrol and sees that Mr. Hartzog has not gotten better. Now, the record on appeal, I said— It got worse. It got a lot worse. Well, I challenged counsel opposite to find anywhere in this record on appeal, which is why I said I wanted to focus on the standard and the record, where he got a lot worse. What did he say? What he did say is that he looked like he had not gotten better. He may have gotten worse. He did not say he had gotten a lot worse. That is not in this record on appeal. And so that's what's so important to focus on here. By the time Detective Hackett came back from being out on patrol, let's think about what had happened. Mr. Hartzog had been brought into the jail. He was able to walk in on his own power. He was brought lunch in the form of a sandwich, juice, and a snack at 1110 a.m. All those things were done. That does not sound like deliberate offense. At 1140 or so, his parent gets there and the sister. A lot of this testimony is focused on the fact that Joanne Davis, the sister, says he looked terrible. Well, here's the thing. Joanne Davis had not seen him on October 19th, the day before. Ms. Hartzog had, the mother. He was covered in scratches the day before from running through the woods. So she comes in. She sees him for the first time, unlike her mother, and says, oh, my gosh, he looks terrible. Well, from that point on, the family is seeing if they can get Dr. Stevens there, for whom Ms. Davis works. The jailers are speaking to Mr. Hartzog. And this is interesting. The head jailer who comes from Virginia, Josh Earl, he's not from this area. He doesn't know Steve Hartzog from anyone. He testified clearly that he spoke to Mr. Hartzog and asked him some questions. And the questions to those answers turned out to be true. And this is that same time period after 1140. So Hartzog's talking at this point. Hartzog is talking at this point. Is the argument. And what Josh Earl says, the head jailer, is I don't know him, but I asked him, what do you do? What do you do for a living? Well, I travel. And keep in mind, he's not speaking like we're speaking now. I mean, they believe he is under the influence of drugs or alcohol, unintoxicated. And here's what is so interesting about all of the initial pleadings in the case right on up to the present. We did not know on the defense side of this case that the cause of death was toxic effects of methamphetamine until we got the death certificate during discovery. It's not even mentioned in the complaint or amended complaint. That is an important fact. Mr. Hartzog had been out and about. They turned him over to his mother. They brought him into the detox cell and had eyes or hands on him at all times. And here's the difference between the best case that the plaintiff has, the best case. I wrote this down earlier. It's a Fifth Circuit case called the Austin case, and that's the boot camp case. But here, the thing about the boot camp case is it says the people in charge there may have only been negligent up until the time that the person in that case became unconscious. That's what we have here. The deliberate indifference in that case was the two hours after he became unconscious. This kid is laying in a cell vomiting and unconscious, and that is the deliberate indifference in the Austin case. So the Austin case— But here's what I don't understand. Hackett was told by the sheriff, if he's not in good shape, take him to the ER. So why didn't they, even if they didn't initially, why didn't they, once he falls on the floor at 11, 10 or whatever, call 911, let the ER guy show up and say he doesn't need to go to the emergency room, or he does need to go to the emergency room. Let the medical guys do the medical thing rather than have these jailers who don't know anything about medicine try to figure this out. Why didn't Hackett do that, or why didn't any of these guys do that? Hackett wasn't there. He was out on patrol. So when he comes— But why didn't he take him to the ER in the first place? That is an excellent point, because he didn't need to. Even now, Mr. Dowdy says, well, he was able—he deteriorated significantly once he was in the jail. So once he's on the ground, why don't you call ER, regardless of whether the sheriff's there or not, you call 911 and let the EMTs say this man needs to go to an ER. They don't take everybody to the ER when they're called. Sometimes somebody's falling, they just pull them back up. I have had personal experience with that in my family. Somebody falls down, the EMTs come, they get him up, they put him in the chair, they look at him, he's okay, they don't take him. So it's not a matter of they would have automatically taken him to the hospital, but if they had concluded he needed to go, then they would have taken him, and then the medical decision would have been made by somebody who knows what they're doing as opposed to these jailers who clearly don't. Great question. And, again, on hindsight, maybe that should have been done. I go back to the standard on deliberate indifference. Did each defendant actually draw the inference that those facts were there and act with deliberate indifference? That's the question. Well, there's no way to prove what's in someone's heart, so you look at the circumstantial evidence, and the evidence here is Hackett was told take him to the ER if he needs to, and no one took him to the ER until he was coding, essentially, at the very, very end. So I don't understand that. I don't understand not calling 911 once he's on the ground. All I can say is that Deputy Hackett was deposed, and he said that the facts that I've spoken of earlier where Mr. Hartzog is able to speak with Josh Earle, he is able to tell the undersheriff that he took prescription, he is able to speak. And at that point, the deputy sheriff did not believe that it was necessary to call 911. Again, that could be, on hindsight, that could be an error in judgment. But was it deliberately indifferent? Not according to the Fifth Circuit, because our best case. I saw in the brief somewhere that one or more of the deputies said they would have sent him to the hospital if the sheriff hadn't told him not to. Is there anything in the record to that effect? No, Your Honor. There is nothing in the record to that effect. In fact, what happened is the sheriff told Shelton Jackson, who is not a party but one of the deputies, on the way out to the second day that they were encountering Mr. Hartzog, if he feels he needs to go to the hospital, take him to the hospital. What is in the record is, did any of these deputies have authority to just release Mr. Hartzog? That is in the record, and they did not. Well, it's not releasing him if you call the EMTs and they take him to the hospital. I mean, people who have committed heinous crimes and are then themselves shot, these mass killers who then are shot, they get taken to the ER and they get treated when they've just shot 30 people. There's nothing Hartzog's accused of that's anywhere remotely close to that. So whatever he's done that pulls him in jail, which would be intoxicated, whatever it is, is not such a heinous crime as these. And yet, nonetheless, those people are taken to the ER and given treatment, and he was not. Why not? It's a fact-intensive investigation that needs to be done of the record on appeal. And the record on appeal shows that Mr. Hartzog was able to speak, again, during the same time frame that he is supposedly after he is seen on the video on the floor. After that time frame, he is talking to Josh Earle, he is talking to the undersheriff, denying that he did anything besides take prescription medication. Those conversations are still happening. Now, again, they are not happening with the clarity that we're having here, but he is able to respond. Now, the best case that we have on the Appalachee side of this is the Allison, the state of Allison v. Wansley case. I think this case is the most factually on point of any of the cases that have been cited, including the boot camp case, as it's called, but the Allison v. Wansley case is extremely important because what happens in that case is the same general thing that Your Honor is asking about here. What about this lady? The decedent goes, of all things, to her date for the victim impact statement for having previously received a DUI. She showed up drunk, and so she was taken to the jail, and she is throughout the almost exact same time period that we're dealing with here, a period of about five to six hours. She can't be roused at times. She is clearly intoxicated, and what this court has said is that it seems objectively reasonable, again, going to the qualified immunity standard, to allow an intoxicated inmate to sleep it off with periodic monitoring. Here there was periodic monitoring. That's not a disputed fact. There was periodic monitoring by video, and then again, this time period when the 911 call was not made, the deputy sheriff is physically present with Mr. Hartzog during that time, and the jailer is physically present with him that entire time, from the time the mother and sister come until 911 is called. This is not a situation where the deliberate indifference is manifest. In fact, after Deputy Hackett called the ambulance, he said, call again. They're taking too long. I mean, once he knew that there was a significant problem, he drew that inference. He wanted the ambulance there, requested the ambulance, and then asked for a hurry up. So, again, looking back at the Allison case, I would just, it quotes a case from the Fifth Circuit. I'm not going to read it, but it does say that this is no different in the Allison case than what we have here, allowing someone who is intoxicated to sleep it off. That's what these deputies thought was happening, and it turned out they were wrong. But were they deliberately indifferent? There is no record evidence that they were deliberately indifferent to his needs. And secondly, in terms of the qualified immunity, an official is eligible for qualified immunity even if the constitutional rights have been violated. And so here, the next question is, would every reasonable person, armed with the knowledge that these deputies had, have concluded that they were violating Steve Hartzog's 14th Amendment right to medical care? And the court below found that that was not the case. Number one, that there was no violation of the 14th Amendment, and then secondly, the actions were objectively reasonable. And so I have time left, but that concludes my argument, unless the court has any further questions. Thank you, counsel. We'll hear from Mr. Dowdy. Thank you. I noticed that a fine opposing counsel has piqued your interest about the statement made by Josh Earls, the jailer, and one or two more, that after the mama and sister had left, and they remained up there in the front of the jail with the guy in the wheelchair slipping out, and they claimed to have had a conversation with him, as if he had some sort of lucid interval. And what I think the trier of fact would focus on is what was going on in the hour or two beforehand when the guy can't talk, when his mama and sister and everybody that was in the room at that time that his head was back, his mouth was open, and all he could say was, uh, uh, uh, uh. And they leave, running what I think is sort of a fool's errand to get a doctor. And then with this lucid interval coming up, he becomes lucid again within a few minutes before he's collapsed and dead. And says, whatever they say the deputy said, oh, he was talking fine right before he died. He was talking fine to us. I believe that a trier of fact would say that the testimony beforehand about his condition and the fact that he died shortly after, we don't believe those statements that were actually made. And the evidence has to be viewed in the light most favorable to my clients. And insofar as the so-called conversations where he lucidly talks to the deputies, we don't think that's supported. That's what I respond to. Thank you. We appreciate it. Very, very tragic case, and we appreciate both sides.